*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0464p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GABRIELLE SMITH; ELIJAH SMITH, minor children of
Glen Smith, by their mother Cheri Janine Smith,
widow of Glen Smith; CHERI JANINE SMITH, widow
of Glen Smith,

　　　　　　　　　　　*Plaintiffs-Appellees,*

　　　　*v.*

JOHN CUPP, Individually and as Sheriff of Hamilton
County, Tennessee,

　　　　　　　　　　　*Defendant,*

MARTY DUNN, Individually and as Deputy Sheriff of
Hamilton County, Tennessee,

　　　　　　　　　　　*Defendant-Appellant.*

> No. 04-5783

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 03-00139—Curtis L. Collier, Chief District Judge.

Argued: March 15, 2005

Decided and Filed: December 2, 2005

Before: MERRITT and ROGERS, Circuit Judges; DUPLANTIER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** W. Jeffrey Hollingsworth, CHAMBLISS, BAHNER & STOPHEL, Chattanooga,
Tennessee, for Appellant. Peter B. Murphy, McCARTHY & MURPHY, Chattanooga, Tennessee,
for Appellees. **ON BRIEF:** W. Jeffrey Hollingsworth, Bret S. Alexander, CHAMBLISS,
BAHNER & STOPHEL, Chattanooga, Tennessee, for Appellant. Peter B. Murphy, McCARTHY
& MURPHY, Chattanooga, Tennessee, for Appellees.

　　　ROGERS, J., delivered the opinion of the court, in which DUPLANTIER, D. J., joined.
MERRITT, J. (p. 10), delivered a separate opinion concurring except as to Section II.A. on
jurisdiction.

---

[*]The Honorable Adrian G. Duplantier, United States District Judge for the Eastern District of Louisiana, sitting
by designation.

1

---

**OPINION**

---

ROGERS, Circuit Judge. Deputy Sheriff Marty Dunn appeals the district court's denial of his motion for summary judgment based on the defense of qualified immunity. On April 28, 2002, Dunn shot and killed Glen Smith, an arrestee who had gained control of Dunn's police cruiser. The district court denied Dunn qualified immunity. Because Smith's right not to be seized by deadly force when fleeing arrest was clearly established at the time he was killed, we affirm the district court's denial of summary judgment.

**I.**

On April 27-28, 2002, Deputy Sheriff Marty Dunn was on patrol in north Hamilton County, Tennessee. During his shift, Dunn responded to a report of harassing telephone calls being received at the home of Janice Quarles, the mother of plaintiff-appellee Cheri Smith. Cheri Smith was living with Quarles at the time because she was separated from her husband, the decedent Glen Smith. Dunn spoke with Quarles about the calls and left.

Later in his shift, Dunn coincidentally observed Glen Smith driving erratically. Dunn initiated a traffic stop and had Smith perform several field sobriety tests. Although Dunn believed that Smith had been drinking, he came to the conclusion that Smith was not so impaired as to justify an arrest. Consequently, Dunn suggested that Smith find a friend to pick him up, and Smith left his car in the parking lot of an adjacent McDonald's restaurant.

Later that evening, Dunn responded to another report from Quarles's home concerning harassing telephone calls. In this second encounter, Quarles told Dunn that some of the calls had been recorded by the answering machine, and that she recognized Smith's voice and heard the name "Dustin" in the background. Dunn listened to some of these recordings and heard someone in the background refer to an item being "smothered and covered," an apparent reference to a method of hash brown preparation at Waffle House restaurants. The calls continued in Dunn's presence, with Dunn answering a few of the calls and identifying himself as a police officer.

Dunn left Quarles's home and went by the McDonald's parking lot where he had left Smith earlier. Dunn observed that Smith's car was still in the lot; however, the car had been moved to a different spot, and Dunn saw a man that looked like Smith get into another car parked nearby. Dunn approached the second vehicle and spotted Smith in the backseat. Dunn questioned the driver of the vehicle, Kate Smith (Smith's sister), and another passenger, Dustin Craig, and these persons indicated that Glen Smith had used Craig's cell phone to make several calls from a Waffle House restaurant. At this point, Dunn proceeded to arrest Smith for making harassing telephone calls in Dunn's presence.

Pursuant to the arrest, Dunn advised Smith of his *Miranda* rights, cuffed Smith's hands behind his back, double-locked the handcuffs, put Smith in the back seat of Dunn's police cruiser, and secured the seat belt around Smith. Additionally, Dunn patted Smith down to be sure that he did not have any weapons or other contraband. Dunn also called for a tow truck to pick up Smith's car. During this period of time, Smith was cooperative with Officer Dunn. However, Dunn did believe Smith to be somewhat impaired. Dunn left the engine running to provide air conditioning. Unfortunately, Dunn's police cruiser was not equipped with a security partition separating the front seat from the back seat. When Dunn left the vehicle to talk to the tow truck driver, named Richard Rutherford, Smith climbed into the front seat and took control of Dunn's cruiser. The facts from this point forward are heavily disputed. The Supreme Court and this court have repeatedly held, however, "that a defendant, entitled to invoke a qualified immunity defense, may not appeal a

district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *see also Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005). Accordingly, although we note the presence of disputes, we take the facts in a light most favorable to the plaintiffs, the family of Glen Smith. The district court carefully set out the differing versions of events leading to Smith's death.

> [W]hen the wrecker arrived Dunn got out of the patrol car to speak to its driver, Richard Rutherford, and fill out the necessary paperwork to have Smith's vehicle towed. During this time, Smith was left unsupervised in the patrol car with the engine running and the keys in the ignition.
>
> As they were going about the business of preparing Smith's car to be towed, both Dunn and Rutherford claim they heard the patrol car being placed into gear and turned to see Smith had made his way into the front seat and was now behind the wheel of the vehicle. Because Dunn had left the dome light in the patrol car on, Dunn claims he was able to clearly see Smith "looking directly at him" while Rutherford claims he could see Smith "in the driver's seat turning the steering wheel." Dunn asserts he heard tires squealing and the sound of hard acceleration. Rutherford does not believe the patrol car "went into a pe[e]l out," but does confirm Smith "floorboarded" the accelerator.
>
> Rutherford states his immediate reaction was to move backwards and around to the front of Smith's vehicle while Dunn claims he [Rutherford] ran in the opposite direction towards the McDonald's restaurant. Rutherford asserts Dunn ran towards the moving patrol car with his firearm drawn and recalls thinking he "was fixing to watch Officer Dunn get run over." Rutherford claims Smith was turning the patrol car to the left, but stated he was not sure whether Smith's swerve to the left was for the purpose of redirecting the car at Dunn or following the roadway around the building (and presumably out of the parking lot). Dunn claims he and Rutherford were standing not more than a vehicle's length from [the patrol car's] original position and that Smith was clearly trying to run him and Rutherford over rather than attempting to leave the parking lot.
>
> Dunn claims Smith "rapidly accelerated directly at [him] and Rutherford" and, "fearing for his life and that of Mr. Rutherford," he "drew his gun and fired four times in rapid succession at Smith." According to Dunn, three of the shots hit the car, the fourth hit Smith "above the left ear," and the patrol car "shot past [Officer] Dunn barely missing him and ran off the parking lot and collided with a tree." Plaintiffs, however, contend Dunn was not acting in self-defense and fired at least the final, fatal shot after the car had passed by Dunn. Plaintiffs claim the fatal shot entered through the driver's side window of the patrol car and struck [Smith] in the ear. For his part, Rutherford recalls Dunn firing "three or four" shots in rapid succession from a position near the drive-thru lane as "the vehicle was going by him." Dunn appears to concede that he fired while the patrol car was passing him, but claims he did so while jumping out of the direct path of the vehicle. Rutherford did indicate Dunn was moving out of the way of the passing patrol car as he fired and, at least at one point, Rutherford believed Dunn had actually been hit by the vehicle.

*Smith v. Cupp*, No. 1:03-CV-139, slip op. at 5-7 (E.D. Tenn. Apr. 22, 2004).

In short, Dunn essentially argues that Smith directed the cruiser at him and Rutherford, or at least Dunn perceived the events in this manner, and that he shot Smith in self-defense as the cruiser was bearing down on them. Dunn continues to argue this version of facts on appeal. The plaintiffs, on the other hand, describe a scene where Smith was merely trying to flee in the cruiser and Dunn purposefully shot Smith under circumstances of no threat to Dunn or others. In addition to the testimony of Rutherford and Dunn described above, the plaintiffs point to the autopsy report as proof that all of the shots were fired either after the cruiser had passed Dunn or, at the very earliest, while the cruiser was passing Dunn with the officer on the driver-side of the vehicle. The autopsy report described the path of the fatal gunshot; the bullet entered "into the left ear . . . , direction left to right, *slightly back to front*, and downward, passing through the left ear" (emphasis added). Finally, the plaintiffs provided evidence that Dunn lied when describing his overall description of events. Another officer responding to the scene reported that Dunn stated immediately after the shooting that Smith had gone for Dunn's gun. This statement has essentially been shown to be a lie, as Dunn stated in deposition that Smith was left sitting in the police cruiser with the windows rolled up, and Dunn has since abandoned any argument that his actions were motivated by an alleged attempt by Smith to go for his gun.[1]

On April 23, 2003, Smith's minor children and widow filed suit against Sheriff John Cupp and Deputy Sheriff Dunn, both individually and in their official capacities, pursuant to 42 U.S.C. § 1983. The claims against Dunn included the wrongful deprivation of Smith's liberty, the use of excessive and unreasonable force in shooting Smith, and the deliberate indifference to Smith's safety and welfare based on the lack of a security partition in Dunn's police cruiser. Following discovery, Dunn moved for summary judgment on all of the plaintiffs' claims, asserting the defense of qualified immunity and arguing that the plaintiffs could not present a *prima facie* case to support the claims against Dunn. Dunn argued in his memorandum in support that his actions were objectively reasonable because: (1) Smith's constitutional rights were not violated; and (2) "it cannot be said that Marty Dunn . . . would have been aware that his actions, which constituted self-defense[,] violated Glen Smith's constitutional rights." On April 22, 2004, the district court granted the defendants' motions for summary judgment on all of the plaintiffs' claims except the claim that Dunn used excessive force in seizing Smith. As to the plaintiffs' excessive force claim against Dunn and Dunn's motion based on qualified immunity, the district court first held that a reasonable jury could find that Dunn's use of deadly force was "constitutionally unjustifiable." The court next held that if the jury accepted the plaintiffs' version of the facts, it could find that a reasonable officer would have known that the use of deadly force was unconstitutional. The district court therefore held that because genuine issues of material fact remained, Dunn was not entitled to qualified immunity, and the court accordingly denied his motion for summary judgment on the excessive force claim.

On May 5, 2004, Dunn filed a motion to supplement the record and to request that the district court reconsider its order denying Dunn's motion for summary judgment. Anticipating that Dunn would file an interlocutory appeal on the excessive force claim, the plaintiffs sought certification for an immediate appeal with respect to the district court's dismissal of the plaintiffs' deliberate indifference claims. On May 26, 2002, while these motions were pending, Dunn filed a notice of appeal to this court. The district court ultimately denied the plaintiffs' motion to certify, granted Dunn's motion to supplement the record, and denied Dunn's motion for reconsideration. This appeal followed.

---

[1]The fact that Officer Dunn lied is only relevant to a jury determination of credibility. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force. *United States v. Robinson*, 414 U.S. 218, 235-36 (1973).

## II.

### A.  Jurisdiction

This court has jurisdiction to hear Dunn's appeal notwithstanding his failure to concede—for purposes of this interlocutory appeal—disputed facts that are favorable to the plaintiff.  It is clear that this court is without jurisdiction to review any argument that depends upon a dispute of facts. "A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established constitutional law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).  Dunn's argument concerning whether there is a dispute of facts, however, is only one of the arguments presented in his brief.  Dunn also argues that the district court misapplied *Saucier v. Katz*, 533 U.S. 194 (2001), by failing to consider whether the right Dunn was alleged to have violated was clearly established.  *See* Appellant's Br. at 16-17.  In this regard, Dunn states that the district court found what it considered to be questions of fact on the first part of the *Saucier* test and granted summary judgment, but that the district court failed "'to ask whether the right is clearly established'" by considering "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. at 16-17 (quoting *Saucier*, 533 U.S. at 201-202).

Dunn has therefore made two[2] main arguments; and this court has jurisdiction to hear Dunn's purely legal argument.  If, "aside from the impermissible arguments regarding disputes of fact, the defendant also raises 'the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law,' then there is an issue over which this court has jurisdiction. Therefore, this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (quoting *Berryman*, 150 F.3d at 562 (internal quotation omitted))*; see also Phelps v. Coy,* 286 F.3d 295, 298 (6th Cir. 2002) ("Where . . . the legal issues are discrete from the factual disputes, we may exercise our jurisdiction to resolve the legal issues only."); *cf. Fultz v. Whittaker*, 88 Fed. App'x 896, 897 (6th Cir. Feb. 24, 2004) (recognizing that exercise of appellate jurisdiction would be proper over issue of law even if that issue was presented only as an alternative to an argument concerning the facts).

The Supreme Court has found no error in this approach.  In *Johnson*, the petitioners argued that it was unworkable for the Court to decide that issues of law were immediately appealable but not issues of disputed fact.  The argument was that a defendant could easily tack on a reviewable claim to an unreviewable claim and thus gain review.  *Johnson*, 515 U.S. at 318.  The Court addressed this concern not by saying that jurisdiction would be lacking over the entire appeal, but rather by expressing confidence in the courts of appeals' ability to determine when it would be inappropriate to exercise pendent appellate jurisdiction over the factual dispute.  *Id.*  The Supreme Court's analysis clearly contemplates that an appellate court would have jurisdiction over the issue of law even when paired with an issue of disputed fact, or there would otherwise be no way for even the possibility of pendent appellate jurisdiction to arise.  Furthermore, in response to the petitioners' next argument that "if appellate courts try to separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that

---

[2] Dunn does not limit himself to arguing that the district court erred in failing to consider whether the right at issue was clearly established, but also raised several meritless issues, such as whether the district court improperly considered Dunn's actions in hindsight or improperly refused to "segment" events leading up to the shooting in considering the reasonableness of Dunn's actions.  This tactic is, however, understandable in light of the timing of Dunn's appeal.  Dunn's brief was filed on December 7, 2004, a few days before the Supreme Court's decision in *Brosseau v. Haugen*, 125 S. Ct. 596 (Dec. 13, 2004), which significantly strengthened the "clearly established" requirement of the *Saucier* test in excessive force cases.  After *Brosseau*, Dunn's argument that the district court failed to consider whether the right at issue was clearly established is greatly strengthened, and should be considered the main argument, even if not originally treated as such by Dunn.

an issue of fact is 'genuine'), they will have great difficulty doing so," *id*. at 319, the Court again indicated that the courts of appeals could distinguish between the two.  In such a situation, the Court held, "the court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Id*.  Therefore, Dunn's decision to argue an unreviewable issue of disputed fact does not impair our jurisdiction over the legal issue presented; following *Johnson*, we "simply take, as given, the facts that the district court assumed when it denied summary judgment." *Id*.

## B. Qualified Immunity

The district properly denied Dunn's motion for summary judgment based on the defense of qualified immunity.  The issue is close, given the very short period of time in which Dunn had to react.  However, the facts, taken in the light most favorable to the plaintiffs, demonstrate that Dunn's use of deadly force violated Smith's constitutional rights.  The particular right at issue was clearly established.  Thus, Dunn is not entitled to qualified immunity.

The United States Supreme Court has mandated the use of the following analysis when ruling on a defendant's claim of qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 200-201 (2001). "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered . . . ." *Id*. at 200.[3]  The answer to both inquiries is yes.

### 1. Constitutional Violation

The plaintiffs have put forward sufficient evidence to show that Dunn's actions violated Smith's constitutional rights.  According to the plaintiffs' evidence, Dunn shot Smith after the police cruiser was past Dunn and there was no immediate danger to anyone in the vicinity.  Dunn's use of force was made even more unreasonable by the fact that Smith had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls. Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force.

Shooting Smith is a seizure subject to the reasonableness requirement of the Fourth Amendment.  *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.

If the facts are taken in the light most favorable to the plaintiffs, no person at the scene was ever in danger.  A reasonable jury could conclude that Dunn did not fire as the vehicle was bearing

---

[3]Two judges of this circuit have recently articulated a number of reasons to eliminate the Supreme Court's requirement that courts always begin with the question of whether a right has been violated, and never begin with the question of whether any such right at stake has been clearly established.  *See Lyons v. City of Xenia*, 417 F.3d 565, 580-84 (6th Cir. 2005) (Sutton and Gibbons, JJ., concurring).  Although the points raised are excellent, like those judges, we continue to follow the order of inquiry the Supreme Court set forth in *Saucier*.  It is true that the Supreme Court in *Brosseau* exercised its discretion to resolve the qualified immunity inquiry without first resolving whether there was a constitutional violation, notwithstanding the Court's earlier contrary "instruction" to the lower courts.  *Brosseau*, 125 S. Ct. at 598 n.3.  As lower courts we are bound to follow the Supreme Court's reasoning and holdings, as much as, if not more so than, its "instructions."  The reasoning of *Brosseau* certainly *permits* us to follow the instructions, however, and we continue to do so.

down on him in fear of his life. Instead, a jury could conclude that Dunn fired as he ran toward the driver side of the car after the car passed him. Rutherford states that Smith was driving the patrol car toward the exit of the parking lot, and Officer Dunn was running to block the exit. Of course, Officer Dunn is constitutionally permitted to put himself in a dangerous position in order to effectuate an arrest. The problem is that, even though Officer Dunn was trying to get between the patrol car and the exit, the evidence permits a finding that a reasonable officer in Dunn's position would not have perceived danger to anyone at the scene. Dunn relies heavily on Rutherford's statement that at the moment when car went into gear Rutherford "thought [he] was fixing to watch Officer Dunn get run over." JA 312. Yet, at the moment that Rutherford felt Dunn was "fixing to get run over," the car was merely being placed into gear. A jury could reasonably conclude that Rutherford really meant that the car was pointed east, in both Rutherford and Dunn's general direction. The "fixing to get run over" statement must be read in context with Rutherford's later contradictory statement that Dunn "was not in front of the vehicle" when Dunn ran "toward the patrol car" and then fired at Smith.

Even viewing the events in the heat of the moment, without 20/20 hindsight, a jury could conclude that a reasonable officer in Dunn's position was never in any danger. Officer Dunn's decision was certainly a "split-second judgment" in a circumstance that was "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. Rutherford said that Dunn was "running towards the patrol car," and Rutherford's diagram shows that Dunn took "four or five steps" towards the left side of the patrol car. The evidence would support a jury finding that Dunn was never in the line of flight based on Rutherford's statement that Dunn "was not in front of the vehicle" when he fired on it. The autopsy report that shows the bullet entered the back of Smith's head, behind his ear, at a slightly back-to-front angle. This report indicates that the police cruiser was likely past Dunn as he fired. Thus, it provides further evidence to support a jury decision that a reasonable officer in Dunn's position would not have felt he was in danger and had the opportunity to choose not to use deadly force to protect himself or others. Rutherford stated he was in no danger. The record does not establish the presence of any bystander other than Rutherford whose physical safety could have been endangered by Smith's actions.

Thus although events developed rapidly, under plaintiffs' version of the facts this is not a case where a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change. *See Troupe v. Sarasota County*, 419 F.3d 1160, 1168 (11th Cir. 2005) (stating 3-5 seconds was a short enough time for the use of deadly force to stop someone who previously endangered police and bystanders even if, in hindsight, the facts show that members of the S.W.A.T. Team could have escaped unharmed); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (holding that shooting within a reaction time of less than three seconds was reasonable, even if in hindsight the facts show that the officer could have escaped unharmed); *McLenagan v. Karnes*, 27 F.3d 1002, 1007-08 (4th Cir. 1994) (justifying the use of deadly force against an unarmed, handcuffed suspect when an officer reasonably believed that a fellow officer had seen a gun in the suspect's hands, in large part because the officer "had no time to consider anything at all.") Instead, this is a case where a jury could conclude that Officer Dunn was not in any danger in the first place. The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force.

Although this circuit's previous cases give substantial deference to an officer's decision to shoot a unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger. In *Smith v. Freland*, this court held that a police officer was justified in using deadly force to stop a suspect from continuing his dangerous flight after the suspect had twice attempted to ram a police cruiser and, having been cornered, turned and sped back up a street endangering a number of officers attempting to stop him. 954 F.2d 343, 347 (6th Cir. 1992). In *Scott v. Clay County*, a car that had nearly hit an unmarked police car at 85 miles per hour was cornered and suddenly accelerated toward an officer. 205 F.3d 867, 872 (6th Cir. 2000). The officer

in *Scott* did not violate the suspect's Fourth Amendment rights when, after being forced to leap out of the car's path, he fired on the car as it turned directly toward another approaching police cruiser. *Id*. In both of these cases, there was no question that the lives of the officers, or the lives of both the officers and members of the public in the area, were endangered by the fleeing suspects. Each suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around. The officers reacted with deadly force only after an extended interaction between police and the suspect proved that the suspect was likely to continue to threaten the lives of those around him in his attempt to escape. These cases do not demonstrate where the line between a threat that justifies deadly force and a threat that does not justify deadly force should be drawn, because use of force was held to be reasonable as a matter of law in both cases.

Though Smith could have used the police cruiser to injure or kill Officer Dunn, under the plaintiffs' version of the facts he was not doing so when Dunn shot him or even before Dunn shot him. Although Smith had possession of a dangerous "weapon," he was not threatening the lives of those around him with it when he was fatally shot. This type of situation does not present "a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005). A jury would therefore be entitled to determine that Officer Dunn's use of force was unreasonable and accordingly unconstitutional.

*2. Clearly Established Right*

It is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon in the back of the head. *See Tennessee v. Garner*, 471 U.S. 1, 9, 11 (1985). "Use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id*. at 11. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend his does not justify the use of deadly force to do so." *Id.*

*Brosseau v. Haugen* does not preclude this court from finding the right at issue was clearly established because the *Brosseau* Court said that undisputed facts showed that the shooting officer believed the suspect had a gun and was fearful for officers in the immediate area. 125 S. Ct. 596, 597-99 (2004). *Brosseau* is instructive on what makes law "clearly established" in a case where an officer shoots a suspect fleeing in a car. *Brosseau* held that the two major excessive force cases, *Tennessee v. Garner* and *Graham v. Connor*, 490 U.S. 386 (1989), did not clearly establish the existence of the right alleged to have been violated in *Brosseau*. 125 S. Ct. at 599. The *Brosseau* Court reasoned that the rule from *Tennessee v. Garner* did not apply because of the substantial risk of danger. *Id*. at 600. In this case, the plaintiff's facts show there was no danger.

The absence of any *Garner* preconditions to the use of deadly force makes this an "obvious" case and distinguishes it from *Brosseau*. In *Brosseau*, the Supreme Court reversed the denial of qualified immunity to an officer sued for Fourth Amendment violations under § 1983 for shooting a suspected felon as he attempted to flee in a vehicle, where the officer had arguable probable cause to believe that the suspect posed an imminent threat of serious physical harm to several officers and citizens in the immediate surrounding area. Unlike Smith, Haugen was a suspected felon with a no-bail warrant out for his arrest, with whom Brosseau had experienced a violent physical encounter prior to the shooting. Believing that Haugen had entered the Jeep to retrieve a gun, Brosseau broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for the safety of those in his immediate vicinity—the three officers on foot, a woman and her 3-year-old child in a small vehicle four feet away, and two men in a parked vehicle 20 to 30 feet away.

The facts in *Brosseau* are not comparable to those in this case. In the light most favorable to Smith, there is no comparable evidence that Dunn had cause to believe that Smith posed an immediate risk of death or serious danger to Dunn, Rutherford, or nearby citizens. Smith was being arrested for a making harassing phone calls, not a crime involving the infliction or threatened infliction of serious physical harm. *Graham*, 490 U.S. at 396. Unlike the situation in *Brosseau*, Smith and Dunn never struggled, Smith never displayed any violent tendencies, and the facts support a finding that a reasonable officer in Dunn's position would not have perceived danger to anyone at the scene. The fact that this case is very different from *Brosseau* permits the conclusion that *Garner*, by itself, clearly establishes the right at issue.

Smith's case is an obvious case where *Tennessee v. Garner* clearly establishes the law. "General statements of the law" are capable of giving clear and fair warning to officers even where "the very action in question has [not] previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, where a general constitutional rule applies with "obvious clarity" to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity. *United States v. Lanier*, 520 U.S. 259, 271 (1997). *Garner* and *Graham* clearly establish that a suspect fleeing in a car that has never posed a danger to anyone has the clearly established right not to be seized with deadly force. Because, *Garner* and its progeny clearly establish that Dunn violated Smith's constitutional rights by shooting him when the facts support a finding that a reasonable officer in Dunn's position would not have perceived Smith endangered anyone at the scene, we affirm the district court's denial of qualified immunity.

### III.

The judgment of the district court is AFFIRMED.

---
**CONCURRENCE**
---

MERRITT, Circuit Judge, concurring. I concur in the Court's opinion except for Section II.A on jurisdiction. The case is primarily a factual dispute, and the jury should apply the "clearly established law" to the facts developed at trial before we review the case.